UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **INDUSTRIAL DIESEL SERVICE, L.L.C.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 08-4258** |
| **M/V QB, her engines, tackle, furniture, equipment, appurtenances, etc.,** *in rem* | **SECTION: "S" (1)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Industrial Diesel Service, LLC ("IDS"), is a an engine repair and service business located in Galliano, Louisiana. In April, June, July, and August of 2007, IDS performed work on the engines of the M/V QB, a vessel owned by Mark & Emmet Marine, Inc. ("M&E"). IDS filed this suit to collect M&E's outstanding balance for that work of $36,895,59, plus $18,816.75 in interest. IDS also contends that it is entitled to recover the costs and attorneys' fees it incurred in bringing this action per the terms of its credit agreement with M&E.

M&E contends that it does not owe any amount to IDS because IDS did not properly perform the work. Further, M&E filed a counter claim against IDS alleging that IDS owes it $175,794.83 for costs it incurred to repair IDS's allegedly faulty work and loss of use damages it incurred due to IDS's allegedly faulty work.

The case was tried as a bench trial, and memoranda supporting the parties' respective positions were submitted to the court.

## DISCUSSION

In 2007, M&E hired IDS to overhaul the starboard engine and perform preventative maintenance on the port engine of the M/V QB. Before the work began, M&E signed a credit agreement with IDS which provided: M&E would pay all invoices on Net 30 terms, i.e. within 30 days of the date on which the goods were dispatched or the services fully provided; any past due balances would accrue interest at a rate of 1.5% per month; and M&E would pay reasonable costs and attorneys' fees should IDS need to hire counsel and file suit to collect sums due from M&E.

IDS performed the work on the M/V QB in April, June, July, and August of 2007. The parties stipulated that IDS's charges for the work were reasonable.

During the overhaul of the starboard engine in April 2007, IDS informed M&E that the #1 bearing cap on that engine was loose. IDS advised M&E that the engine manufacturer, Detroit Diesel, recommended replacing all bearing caps and re-machining the engine block following a major overhaul. M&E elected to reinstall the old bearing caps and not to re-machine the engine block.

**A.    The July 12, 2007, Port Engine Failure**

On July 12, 2007, the M/V QB returned to service after a major overhaul of the vessel, which included IDS's work on both the starboard and port engines. Before the vessel departed, her crew inspected all of the water hoses and clamps on the port and starboard engine cooling systems, and determined that they were properly installed and tightened. However, none of the vessels' crew bled air out of the engine cooling water system before the vessel departed.

Within fifteen minutes of the vessel's departure, the high temperature alarm sounded, indicating that the port engine was overheating. Richard Mejia, the M/V QB's captain, immediately pushed the vessel onto the bank, shut down the engines, and went into the engine room. In the engine room, he saw that the port engine was at an excessively high temperature, that the day tank, which held water for the engine cooling system, was full, and that the water hoses were firmly in place and not leaking. Mejia contacted Mark Bruce, M&E's owner, to discuss the problem. Mark Bruce told Mejia to continue on the voyage, and to bleed air from the engine's petcock valve.

As the M/V QB continued on her voyage, Mejia increased the speed. Again, the high temperature alarm sounded, indicating that the port engine was overheating. Mejia again shut off the engines and went to the engine room to inspect the problem. He found that the day tank was still full and the hoses were not leaking. Thus, he concluded that there was air in the engine cooling system, and directed the engineer onboard, Travis Bruce, to bleed air from the petcock valve. Travis Bruce also inspected the port engine and found that there was water in the day tank, that the clamps on the water hoses were securely in place, and the water hoses were not leaking.

Within thirty seconds of Travis Bruce's departure from the engine room, he observed steam coming from it. At the same time, Mejia heard the high temperature alarm sound, and saw that the port engine was overheating. The low water alarm did not sound, indicating that there was water in the day tank.

Walter Kleban, an expert in Detroit Diesel engines, testified that the port engine failure on July 12, 2007, was caused by the crew's failure to properly bleed air from the engine cooling system. He testified that a competent crew should know, and that the M/V QB's crew did know, that air could be present in an engine cooling system after a vessel has been in dry dock. Kleban also

testified that once the first high temperature alarm sounded, the vessel's engineer should have been stationed in the engine room to monitor the temperature and communicate any temperature increases to the captain so that the captain could reduce the speed, allowing the engine to cool and shrinking the size of any air pocket that was causing the engine to overheat.

Because nobody was monitoring the engine temperature, the engine cooling system pump on the port engine became air bound, which prevented cooling water from flowing through the engine. The stagnant water in the engine was heated and reached its boiling point, creating steam which increased the pressure in the engine and caused it to fail. There is no evidence that the hoses were loose or that water leaked out of the day tank prior to the engine failure.

The court finds that the July 12, 2007, port engine failure was caused by the M/V QB's crew's failure to properly bleed air from the engine cooling system.

**B.     The August 17, 2007, Starboard Engine Failure**

On August 17, 2007, the M/V QB's starboard engine failed. Mark Bruce testified that he knew that Detroit Diesel recommended changing the oil and filter after every 150 to 200 hours of operation. Travis Bruce and Adam Trahan, another engineer on the M/V QB, admitted that the oil in the starboard engine was not changed from July 11, 2007 to August 17, 2007. The M/V QB's billing logs show that the vessel was in operation for almost 300 hours during that time.

Travis Terrebonne, the owner of IDS and a certified Detroit Diesel mechanic, testified that when he inspected the M/V QB's starboard engine after the August 17, 2007, failure, he found that it contained perfectly clean oil. He concluded that the crew put fresh oil into the starboard engine after the failure, because once an engine is started with fresh oil, the fresh oil mixes with the existing oil, picks up dirt and other panicles, and turns black.

Additionally, Kleban testified that the August 17, 2007, failure of the starboard engine was caused by the crew's failure to change the oil after 150 hours of operation as recommended by Detroit Diesel. Kleban testified that all of the bearing shells were scratched and scarred by dirty oil and that the layers were wearing away. He testified that this type of damage leads to metal on metal contact between the crankshaft and bearings, and eventually to engine failure.

M&E contends that the starboard engine failure was caused by a sprung bearing cap that IDS should have replaced during the overhaul of the starboard engine. Jeremy Barfield, an IDS employee who worked on the overhaul of the M/V QB's starboard engine, testified that, during the engine overhaul, he found that the number 1 bearing cap was sprung. Terrebonne testified that he examined the starboard engine and discussed the situation with Mark Bruce. Terrebonne told Mark Bruce that he could not say how long the cap had been sprung, how long the engine had operated in that condition, or how long it would continue to do so. He also told Mark Bruce that Detroit Diesel recommended replacing the cylinder caps and re-machining the engine block, which would cost an additional $35,000 to $40,000, and take several more days of work. Terrebonne testified that Mark Bruce elected to re-use the old bearing caps. Barfield's testimony regarding this conversation was consistent with Terrebonne's testimony.

Mark Bruce testified that he never had a conversation with Terrebonne about a sprung bearing cap in the starboard engine. However, throughout his testimony at trial, Mark Bruce was impeached with inconsistent testimony from his deposition. For example, at trial Mark Bruce testified that the oil should be changed every 200 to 300 hours, but at his deposition he testified that he knew it should be changed every 150 to 200 hours. Further, Terrebone and Barfield both testified that IDS, as mechanics, had no motivation for not informing Mark Bruce about the sprung bearing

5

cap and recommending that more work be done. Additionally, Kleban testified that the heaviest damage in the starboard engine was found in the bearing caps over the number 6, 7, and 8 cylinders, which are on the opposite end of the engine as the number 1 cylinder, which had the sprung bearing cap.

The court finds that the August 17, 2007, starboard engine failure was caused by the crew's failure to timely change the oil and filter in accordance with Detroit Diesel's standards. The court does not attribute fault to IDS for any failure caused by the sprung bearing caps.

C.     **The September 26, 2007, Port Engine Failure**

On September 26, 2007, the M/V QB's port engine failed. That engine was a rebuilt engine that was provided to M&E by IDS after the July 12, 2007, port engine failure. The cause of the September 26, 2007, port engine failure is undetermined. M&E contends that the engine failure was caused by a bolt failure of the tortional damper plate. M&E did not permit IDS to inspect the port engine after the September 26, 2007, failure, and no photographs were taken of the allegedly defective parts. No expert conclusively testified as to the cause of the September 26, 2007, port engine failure. M&E did not carry its burden of proving that IDS was responsible for the engine failure, and therefore the defense of poor workmanship does not apply.

## CONCLUSION

It is undisputed that IDS performed work on the M/V QB for which M&E has not paid, and that the amounts IDS charged for that work were reasonable. The court finds that M&E was at fault for the July 12, 2007, port engine failure and the August 17, 2007, starboard engine failure, and that M&E did not prove that IDS was at fault for the September 26, 2007, port engine failure. Therefore, M&E is liable to IDS for its unpaid balance of $36,895,59, plus $18,816.75 in interest.

M&E's credit agreement with IDS provides for responsible for reasonable attorneys' fees and costs incurred by IDS in any collection action. The court awards reasonable attorneys' fees and costs incurred by IDS in filing this suit to collect on M&E's account.

New Orleans, Louisiana, this __18th__ day of November, 2010.

*[signature]*
MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE